Q And you never signed another lease, right?
A No. I don't think anybody in that building signed a lease. Everyone was just kind of there.
Q It was your understanding after the period of the lease was over, which would have been August 31, '96, was it your understanding that basically you were on a month-to-month lease with the owner of the building?
A Yes. I talked to Vern after this lease was up, and it was actually kind of a nonchalant conversation. I talked to him about the lease being up and he asked me if I wanted to sign another lease. And I said well, sure, that would be fine. I don't know if the paperwork ever made it over to us. I don't think it did. Just stayed on month to month, I guess, without a lease. It was never a problem.
Q And you understood, then, after the lease was over that you could leave if you wanted to with 30 days notice or so and -- go ahead.
A I was just going to say I actually thought I was still under the two months or, you know, whatever.
Q And did you understand also that the landlord

Q Then on 11/5/98 you received a rent past due notice under your door or at your door.
Was it posted on your door or was it under your door?
A It was just like stuffed in between the door and the frame.
Q And I take it that wasn't really surprising to you because the rent was due on the first at least under the new management, right?
MR. CUMMINS: Objection, form.
THE WITNESS: It was surprising that it would be left at our door at 7:30, between 7:30 and 8 p.m. because we had mailed it on the fourth so they should have received it sometime in the afternoon on the fifth. So on that evening of the fifth they are indicating to us that they still have not received our rent so that was surprising.
BY MR. EDWALL:
Q Well, do you know whether your husband mailed it on the morning of the fourth or the afternoon of the fourth?
A It went out -- my husband told me it went out in the mail on the fourth because he mailed it from his office is what he told me.

Q Do you know what time they pick up mail at his office?
A I wouldn't know.
Q And did you call the office, then, as you state later there in your 11/5/98 entry?
A Yes. I called the office. Like I said, I was concerned. My husband is very responsible so I know it had been mailed on the fourth and had gone out, and why they hadn't received it on the fifth concerned me a little bit but not that much. I figured, you know, maybe it was a mistake, didn't think too much of it, just called the office and let them know that it had been sent out and to give me a call.
Q And your next entry in your discrimination statement, Exhibit 3, is "Didn't hear from them about the check, so we thought they received it," right?
A Correct.
Q And then your next entry is on 11/9/98. "There was no hot water so we paged the emergency staff."
What was the problem with that?
A That morning we woke up to get ready for work and school and went to take a shower and there

believe that he might have known your race at the time that this was served on November 9 was our supposition that he may have been in your apartment and he may have seen some photographs?

MR. CUMMINS: Objection, form; mischaracterizes testimony.

MR. EDWALL: I don't think it mischaracterizes at all.

THE WITNESS: I wouldn't know for sure where Kreisler had seen us.

BY MR. EDWALL:

Q I understand your answer is that you don't know whether he knew -- in essence, you don't know whether he knew your race or not, right?

MR. CUMMINS: Same objection.

BY MR. EDWALL:

Q As of November 9 but he might have, right?

A It's possible.

Q So it's my understanding you and your husband, and I take it your children were living with you at this time, right?

A We didn't have children.

Q Excuse me. I'm sorry. I got the dates wrong.

You and your husband were sitting there waiting for the hot water to be fixed and you were served with an eviction summons instead, right?

A Correct.

Q Did that upset you?

A I think a little bit. I mean, I think it confused us more than anything.

Q Did you discuss with your husband the reaction that you had to this new management company or the opinion that you had of this new management company that you were waiting for the hot water to come and you got served with an unlawful detainer?

A I'm not sure I understand the question.

Q Did you discuss the fact that you were with your husband, Mr. SternJohn, that you were sitting there waiting for the water to be fixed, the hot water to be fixed and you got served with an unlawful detainer?

A There really wasn't any discussion because we were both there. And especially since we didn't really know what a UD was, it took us a while to kind of, oh, it's an eviction.

Q In your discrimination statement, Exhibit 3,

Q Well, the court's asking roll call. You were there before court started, before roll call started, right?
A Yes.
Q And you sat behind him but you and your husband didn't know who he was?
A He had his back to us. Actually, I don't think he came until a little bit later than we did. And he sat down, had his back to us. We were discussing things amongst ourselves. After they took roll call, he got up and went to the front of the court and was talking with I believe the clerk or whoever that is up there and that was it.
Q Did you go up to the clerk and say, hey, what are we doing here, can we get our case dismissed or something or words to that effect?
A We had never been in court before so we had no idea what the procedure was. We were just there to follow how they proceed. So we're just kind of going along with what we thought we were supposed to be doing.
Q And then you say, "After role call he," meaning Mr. Voak I take it, "went up to the

clerk and asked her to dismiss our case," right?
A Yes. We found that out later that he had dismissed our case.
Q But did you see him go up to the clerk?
A Yes, we did.
Q You say we stayed there the whole day waiting for our case to be called. I think you said in one of your other statements you were there about three hours.
Is that right?
A That could be correct. At least, yes.
Q And you were watching unlawful detainer court?
A Yes.
Q You say "About five minutes before the last case was done he finally told us he had dismissed our case."
A Yes.
Q Was he setting in front of you again?
A Well, what happened was -- I believe it was because of this motion to be seen in front of a judge. And nobody told us this, we found out from one of the other people that was there, but we were still sitting in the first courtroom you come to to do the roll call.

And then Asa disappeared and so did one of the other people that had a case with Kreisler. They disappeared. And so we were just sitting there and sitting there and sitting there and we hadn't seen him for a while. Then one of the other people that we had -- it was this neighbor, actually, this new neighbor. She came back and tapped us on the shoulder and said, you know, they're hearing our case in a different courtroom. Let's hurry up and get over there. And I don't know how she found out.

So we run over to the other courtroom and we sat in the back. Asa was up in front at one of the tables with somebody else and they were talking about their case. And I think we made mention to the judge that we were here and that we didn't know that it had been changed to a different room. Nobody had told us. Then at the end they didn't call our case. The judge and everyone was packing up leaving. We said, hey, wait a minute, we have a case too. And he said, you know, what is your name. We told him. He said I don't see anything here. Actually, I'm sorry, Asa had

Q And did she say why?
A No, not to my knowledge.
Q What was her race?
A She was white. That was the one person that I knew.
Q Was she successful or was her case dismissed or how did it work out, do you know?
A It wasn't dismissed. She worked something out with Asa which included a getting her deposit back, I believe, and she moved out.
Q It was resolved?
A Yes.
Q And then I take it that you confronted, you and your husband confronted Mr. Voak about why he didn't tell you earlier that your case was dismissed.
Is that right?
A Yes.
Q And Mr. Voak told you he didn't know that you were the ones who were the parties in that case.
Is that right?
A Correct.
Q But you didn't believe that, what Mr. Voak said?

A No. I had no reason to believe what he said.
Q You had never met Mr. Voak before other than -- well, you hadn't met him before, had you?
A I had no reason to believe that he didn't know who we were since he looked right at us when they said our names and we said here.
Q But you had never met Mr. Voak before, right?
A No. Not talked with Mr. Voak before.
Q Is Mr. Voak Asian in appearance?
A No, not in appearance.
Q And then since you didn't believe him, your husband at least said to Mr. Voak that he did know it was you because he had looked right at you just as you said, right?
A Exactly.
Q Mr. Voak then said to both of you that he wasn't going to be called a liar and walked past you to leave.
Is that right?
A Correct.
Q And then you walked behind him without saying anything, behind Mr. Voak.
Is that right?
A Yes. We were in a courtroom --

when I said something to him, I don't think he knew that I was there.

Q Well, you weren't making any noise behind him, were you?

A No, just walking.

Q And he didn't turn and say something to you, did he?

A No.

Q And your understanding is that he was saying this to himself, in essence?

MR. CUMMINS: Objection, form.

THE WITNESS: I could only guess who he was talking to. There wasn't anybody else there but us and him. So that's why I said I'm only speculating that --

BY MR. EDWALL:

Q Well, did he say -- what he said was I'm tired of having to deal with niggers, right?

A Correct.

Q And that's pretty much verbatim what he said?

A Yes.

Q And you say you heard him mutter, okay?

A Yes.

Q When you say mutter here in your statement, your discrimination statement, what do you

mean by that? He kind of said it in a muffled tone?

A Kind of under his breath.

Q Under his breath?

A Yes.

Q Under his breath, walking, what would be perceived as away from you, right?

A Yes. Just kind of -- I think he, you know, was just walking out, his stuff with him and was just leaving.

Q He had said it basically to himself, right?

MR. CUMMINS: Objection, form.

BY MR. EDWALL:

Q In your understanding?

A It seemed that way.

Q So as far as your understanding and your belief, he was not trying to insult you at that time?

MR. CUMMINS: Objection, form; legal conclusion.

BY MR. EDWALL:

Q He was dealing with his own, whatever they are, problems?

MR. CUMMINS: Same objections.

THE WITNESS: I wouldn't know.

BY MR. EDWALL:

Q But he didn't direct this at you at that time?

MR. CUMMINS: Same objections.

THE WITNESS: I wouldn't know.

BY MR. EDWALL:

Q Did Mr. Voak say anything else to you or in your presence that you heard at that time?

A Not that occasion, no.

Q And then you say in your discrimination statement that you said to Mr. Voak, after he made this statement, it's offensive, you said to him, "What did you say?"

Is that correct?

A Correct.

Q Is that because you hadn't clearly heard what he said?

A No. I clearly heard what he said.

Q You just wanted to repeat it?

A Yes. It was more out of shock than anything.

Q And then Mr. Voak turned around?

A Yes.

Q And turned around to face you because you were walking in the same direction at this time, right?

A Correct.

Q And when he turned around, he had a shocked look on his face?
A Correct.
Q So he, at least in your understanding according to your discrimination statement here, Mr. Voak was surprised in your view that you had heard what he had said?
MR. CUMMINS: Objection, form.
THE WITNESS: Correct. I think that he was surprised that either I was standing there or that I heard it.
BY MR. EDWALL:
Q And then you turned to your husband to ask him if he had just heard what Mr. Voak had said, right?
A Yes.
Q And your husband is still back at the table?
A Correct.
Q Getting the documents?
A Correct.
Q And then you saw Asa run out of the courtroom door, right?
A Yes.
Q Was he actually running?
A Well, it wasn't much of a run. We were almost

(Deposition Exhibit No. 14 Marked for Identification)

BY MR. EDWALL:

Q Showing you what's been marked as Exhibit 14, is that a letter that you wrote to Kreisler Real Estate on about December 10, 1998?

A Yes. This looks like the letter.

Q And you told Kreisler Real Estate Company that you believe that they were acting in violation of Minnesota law, right?

A That's what I had been advised, correct.

Q Who was the lawyer that you spoke to? Just tell me his name.

A I don't have a name. I spoke to someone, I believe, at the University of Minnesota Law Project.

(Deposition Exhibit No. 15 Marked for Identification)

MR. CUMMINS: Can we go off the record for a second?

(A discussion was had off the

you had asked for previously, right?
A Correct.
Q And this was after you had already called the inspectors and they had issued these orders, right?
A Correct.
Q At this point in time of December 30, 1998, you did not want to leave the building even though you were dissatisfied with the state of your apartment to the extent that you were calling the housing inspector, right?
A I was dissatisfied with his unwillingness to complete repairs.
Q But you didn't want to leave the building?
A No.
Q So in your view, I take it, then, the apartment was livable but you wanted it to be better, right?
MR. CUMMINS: Objection, form; asked and answered.
THE WITNESS: I believe I did answer that.
BY MR. EDWALL:
Q Well, I'm asking you on December 30 when you wrote this letter. I don't think you did

answer it and I don't appreciate your counsel's coaching you either.

A There wasn't any coaching and I'm just stating that it was asked and it was answered.

Q So you're going to refuse to answer the question?

A No. I'm just letting you know that it had already been answered.

Q Well, let me break it down. As of December 30, 1998, did you consider the apartment to be livable enough so that you would stay there?

A It was livable enough, particularly because it was our home, but it needed to be repaired.

Q And you had already heard, as of the time of your calling the inspector and getting the inspection which resulted in the order which is Exhibit 16, you had already heard of the rent escrow procedure, correct?

A Yes.

Q Was that one of the reasons you called the inspector was to set up a claim for a rent escrow procedure?

A No because actually I had the ability to file rent escrow starting with the letter from

A Yes.
Q What was your understanding of what the court was doing there? Let me ask it this way.
Did you understand that he was basically giving you January rent free and another month rent free unless the violations were alleviated?
A It appeared --
MR. CUMMINS: Objection, form.
THE WITNESS: It appeared to be that way.
BY MR. EDWALL:
Q So the rent that you deposited, then, in the next part of the order, is ordered that the rent now on deposit shall be released as follows: $440 to plaintiff.
So I take it you got your January rent that you deposited with the court back, correct?
A Yes. I believe what happened was that I had deposited, we had deposited the rent when we filed this of $440.
Q Right.
A And according to this, the rent was released back to me. And the paragraph above that was

saying that our rent is abated by $880 total through January 1999.

Q Right. Then it goes on to say, "Future monthly rent is abated by $150, and the balance of $290 paid directly to defendant," right?

A Yes, that's what it says.

Q Then "Rent abatement shall terminate for the first rental period following Defendant's completion of repairs" and "Defendant is ordered to remedy violations on or before 2/24/99" and a compliance hearing is set.

So it was your understanding that now your future rent was going to go down to $290 from the 440 that it was set, correct? Is that your understanding of what the order was saying?

MR. CUMMINS: Objection, form.

THE WITNESS: It's my understanding from this order that our rent is to be abated to the amount of $290 and that would take effect until we were to appear for a compliance hearing set for February 26.

BY MR. EDWALL:

Q Right. And then it actually goes on, on the

next page, to say that you get some additional, an additional $440 for future rent obligations to satisfy the retroactive abatement?
A Correct.
Q Basically you went into court and you got an order that said you got two months of rent free, right?
A Basically, yes.
Q And then any future rent would be in the amount of 290 rather than 440, right?
A That's what it appears to be saying.
Q When you started to owe rent, if you ever did, and you would only owe rent when the repairs were completed.
And were you satisfied with the court's decision in that case?
A I would have been more satisfied if I would have had the repairs done, but as they stood, that would have had to do.
Q Well, nobody cut you off or anything? You were given a full chance to prove your case, right, for the amount of damages that you desired?
MR. CUMMINS: Objection, form.

Kreisler Real Estate's conduct. Did you consider moving?
A As of March, no.
Q Why not?
A We were still hoping that things would work out, that he would just complete the repairs and he would just fulfill his responsibilities.
Q And you had never heard at that time that there was any limitation on Mr. Kreisler's ability to do any repairs, had you?
MR. CUMMINS: Objection, form.
THE WITNESS: We had no knowledge that he had any limitations at all. We seen that he was redoing other apartments, he was completing repairs for other people, including replacing a refrigerator for our next door neighbor even though he had a court order to do ours.
BY MR. EDWALL:
Q Who was your next door neighbor whose refrigerator got replaced?
A Muriel Norge.
Q And do you know what was wrong with her refrigerator?

A It broke down.
Q Did it not work at all?
A That I don't recall. I don't know if it completely ceased to work or if it was just hampered from working properly in some way.
Q You know that yours worked? I mean, it made cold but it froze the food sometimes, right?
A Yes. It was --
Q It didn't work right?
A It was like stuck on the wrong setting or something.
Q But it didn't completely fail to work, right?
MR. CUMMINS: Objection, form.
BY MR. EDWALL:
Q You still used it?
A We had to. It was the only thing there.

(Deposition Exhibit No. 23 Marked for Identification)

BY MR. EDWALL:
Q Showing you what's been marked as Exhibit No. 23, it says unlawful detainer decision and order but it's really probably a rent escrow thing?

THE WITNESS: Sounds about right.

BY MR. EDWALL:

Q Then it says it is now appropriate to fine the defendant. It says appropriate to increase the rent abatement to, what is that number? Two fifty or three fifty? It looks like it was typed in there.

A Yeah. He wrote it or he typed it at something and then I think he upped it to 350.

Q And then the rent abatement will continue. You paid a sum of rent to Mr. Kreisler -- I'm trying to figure out what the numbers are in terms of what you paid because this says your March rent is abated but you already paid it. It's abated by 350.

Do you know how that worked or did some of that abatement go over into the next month?

A I believe that the abatement was starting for the next month.

Q It says in the order in part 9 on the second page, "Plaintiff is authorized to make repairs at the premises and deduct the costs, expenses, etc. from future rent. Plaintiff shall retain all bids, invoices, etc. and

submit them to the Court for approval."

Did you make any attempt to do that?

A Where are you at?

Q On the second page, the typewritten part, No. 4.

A Oh, No. 4.

Q No. 9 on the left after rent into court. Okay. Right here.

MR. CUMMINS: He said No. 9 here and then No. 4.

THE WITNESS: Okay. That's what it says.

BY MR. EDWALL:

Q My question was did you do any of that stuff?

A I'm sorry.

Q Did you go out and get some bids on getting the refrigerator fixed, for instance, or getting the nails hammered down so at least the safety issues that you perceived would be taken care of?

A I believe we called some people to ask them about, like, how much a new refrigerator would be or something like that and the cost was more than what we could afford.

Q You had paid very minimal rent since, what,

January at that time.
Isn't that right?
A Correct.
Q How much were the refrigerators that you were looking at?
A I don't recall because it wasn't just refrigerators. It was other things that needed to be fixed. So I don't recall.
Q You might have called and looked for a new refrigerator but you don't recall?
MR. CUMMINS: Objection, form.
THE WITNESS: Not three years later, no.
BY MR. EDWALL:
Q And you were supposed to pay in $190 into court for the April rent, right?
A That's what that says.
Q What did you do with the money that you didn't pay for rent in these months?
A I'm sure I don't recall exactly.
Q But you didn't have any repairs done yourself even though the court said you could?
A Not at the expense that we were being told, no.
Q What others, other than the refrigerator, were