Q Do you recall that in the months or the period leading up to the transition from Mr. -- from the Solar Partnership ownership to Mr. Kreisler's management of the building, Mrs. SternJohn or Mr. SternJohn or both the them making a number of maintenance or repair requests to you?
A Not that I remember.
(Whereupon, Exhibit Number 1 was marked for identification.)
BY MR. EDWALL:
Q Did you -- when a resident would make a complaint -- or a request for maintenance or repairs to the apartments, would you ever just ignore their requests?
A No.
Q Would you do nothing about their requests?
A I reported it to -- if it was a maintenance request I reported it to the maintenance person.
Q What if a resident wanted new carpet in their apartment; would they ask you for that?
A They would inform me and then I would report it to the other authorities.
Q And the other authorities might go as high as the owner if it's an expensive thing like new carpet, right?
A Right.

Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Eboni SternJohn and Julius SternJohn,

Plaintiffs,

v.

Robert L. Kreisler, Jr., a/k/a Bob Peterson, a/k/a Robert Peterson, d/b/a Kreisler Real Estate Company, d/b/a Whittier Real Estate Company, d/b/a KT Properties Partnership L.P., d/b/a Whittier Community Apartments, d/b/a Bristol Apartments; Solar Partnership a/k/a Solar Partnership, L.L.P., a/k/a Solar Partnership I, L.L.P., a/k/a Solar Partnership III, L.L.P., a/k/a Solar Partnership IV, L.L.P., d/b/a Solar Corporation; and Larry Hopfenspirger, d/b/a Hopfenspirger, Realty, Inc.,

Defendants.

Court File No.: 02-CV-842 MJD/JGL

**AFFIDAVIT OF LAVERN HILLER**

---

STATE OF MINNESOTA )
)SS.
COUNTY OF RAMSEY )

LaVern Hiller, after being duly sworn under oath, states as follows:

1. My name is LaVern Hiller. I make this Affidavit of my own personal knowledge.

2. From 1993 through most of 1998, I was the resident manager of 2421 Pillsbury Avenue, which was owned by Solar Partnership.

3. I was the resident manager when Eboni Stern and Julius John were tenants of a one-bedroom apartment, #206, and they informed me that they had water leakage into their bedroom from the roof of the building at 2421 Pillsbury Avenue in 1998. I reported this to the property manager, and the property manager of the building suggested that I inspect the damage to the



Exhibit C

apartment of Ms. Stern and Mr. John.

3. On three (3) occasions, I left notes between the door and door frame of apartment #206 which was inhabited by Eboni Stern and Julius John stating that the maintenance man and myself would like to view the water damage. Each time we gave a time on the note when we would arrive.

4. When the maintenance man and myself came to the door at the appointed time, we found a note taped to the door of the apartment of Eboni Stern and Julius John stating that "this was not a good time" or words to that effect and that we would have to come back at another time.

5. We repeatedly attempted to get access to the apartment of Eboni Stern and Julius John to inspect the claimed water damage. At least three (3) times, to the best of my recollection, we received notes on the apartment door of Ms. Stern and Mr. John stating that we would have to come back at another time.

6. After approximately three (3) times when we could not receive access to the apartment, we finally did get Ms. Stern and Mr. John to consent to allow us to view the damage. When we looked at the claimed damage, we found dampness on one corner of the bedspread and comforter in the bedroom. The management then had the comforter dry cleaned and made arrangements to have the roof repaired.

Dated: 03/14, 2003

FURTHER YOUR AFFIANT SAITH NAUGHT

LaVern L. Hiller

LaVern Hiller

Subscribed to and sworn to before me this

14 day of March, 2003.

Penny S Ream

Notary Public

PENNY S. REAM
Notary Public
Minnesota
My Commission Expires Jan. 31, 2005

Q You never remember an instance where a tenant was allegedly late paying rent?
A Allegedly? No. I can't answer the question.
Q Mr. Kreisler, do you ever remember an instance in which a tenant was late in paying rent?
A Yes.
Q Speaking of those instances in which tenants were late, from your perspective, in paying rent, do you ever remember allowing a tenant additional time beyond the normal deadlines to pay the rent in light of their past history of paying rent on time? Do you understand the question?
A I understand. But it's still not a very clear question.
Q Answer it to the best of your ability.
A Yes and no.
Q Showing you Deposition Exhibit 7, let me know when you've had a chance to read it.
A (Witness examining document). I have read it.
Q Why did you say that you would no longer accept verbal or telephone requests for maintenance?
A I believe the reason was that they were inaccurate, troublesome, nondependable, those three reasons and probably a lot more. But

Exhibit D

those three reasons come to mind.
Q Is it fair to say that your policy was to address maintenance issues within 48 hours?
A That was our policy.
Q Was that written down anywhere besides in this letter that constitutes Exhibit 7?
A I don't know.
Q Why did you offer a $5 incentive to report maintenance issues to tenants in this letter?
A I guess I look at what the letter says. And it reflects that we wanted to have them use the maintenance request cards, if you will. To do so, we initiate a $5 rent credit so that would allow them to use that and take advantage of it.
Q Did you talk to Mr. Hopfenspirger about that?
A I don't recall.
Q Did you ever in fact give out rent credits to any tenants at the two properties?
A I don't recall.
Q Mr. Kreisler, while you were managing the two properties prior to taking full ownership, did you do any significant improvements to the properties?
A Prior to taking over management?
Q Taking full ownership.