Affidavit of Cathy Cloud

State of Maryland )
) ss.
County of Prince Georges )

Being duly sworn on oath, Cathy Cloud states the following:

1. I am Vice President of the National Fair Housing Alliance (NFHA), a fair housing organization based in Washington, D.C. The Court has designated my organization as the independent housing agency charged with monitoring compliance with the Consent Decree in SternJohn v. Kreisler. I am the point person for NFHA regarding this monitoring function. I give this affidavit based on first-hand information.

2. The Court adopted the Decree in December of 2004. Because Mr. Kreisler had not identified a management company, we had no contact information for arranging the initial fair housing training, fair housing testing, and other monitoring functions for some time. In fairness to housing providers, NFHA's practice is to conduct testing and other monitoring activity after those providers have the benefit of NFHA's fair housing training. In March, 2005, I was contacted by phone by a representative of the management company, so NFHA then tried to implement its monitoring function.

3. Before NFHA could begin monitoring, Mr. Kreisler objected to having each of his properties tested for fair housing violations at least once a year. According to Mr. Kreisler's counsel, Mr. Kreisler would only agree to 4 paired tests when 6 buildings are covered by the Decree. NFHA sought to 8 paired tests per year, so that two additional tests could be done in the event that one of the initial tests identified potentially discriminatory treatment. After weeks of discussions with NFHA, Mr. Kreisler's counsel advised me that Mr. Kreisler would agree to a

maximum of one test at each of the 6 properties covered by the Decree. On June 22, 2005, NFHA signed the contract with Mr. Kreisler whereby Mr. Kreisler would pay NFHA for the monitoring functions NFHA performed. Mr. Kreisler did not execute the contract until September 6, 2005. A true and correct copy of that contract is attached as Exhibit 1.

4. NFHA's initial fair housing training for Mr. Kreisler and all his agents, which was to happen under the Decree by February, 2005, also continues to be delayed. Some delays were due to Mr. Kreisler's failure to sign the contract, and other delays were due to Mr. Kreisler's failure to agree on a date for training. During the summer of 2005, I provided a series of possible training dates to Marathon Management, the company operating the properties covered by the Decree. Marathon Management told me that Mr. Kreisler was not responding to the requests for a date, requiring additional rescheduling by NFHA. Attached as Exhibits 2-3 are true and correct copies of illustrative communications.

5. On August 26, 2005, Marathon Management informed me that its business relationship with Mr. Kreisler had been suspended because he had not paid management fees for June and July. Attached as Exhibit 3 is a true and correct copy of that communication. On September 9, 2005, Marathon Management advised me that, after Marathon had retained counsel in order to obtain payment of its fees by Mr. Kreisler, the business relationship between Mr. Kreisler and Marathon Management had resumed and we could set a date for training. Attached as Exhibit 4 is a true and correct copy of that communication.

6. After multiple delays and scheduling changes, we agreed on a date for the initial fair housing training for Mr. Kreisler and his agents. That date, December 7, 2005, was approximately one year after the Court adopted the Decree.

7. On November 22, 2005, I contacted Marathon Management to confirm arrangements for the initial fair housing training of Mr. Kreisler and all agents. On November 23, 2005, Marathon Management responded by informing me that its relationship with Mr. Kreisler had been severed on October 7, 2005. Attached as Exhibit 5 is a true and correct copy of that communication.

8. Without knowing the identity of the new management company – or even if there was a management company in place – I contacted Mr. Kreisler's counsel. Unable to speak to counsel directly, I left a message seeking to reschedule the fair housing training, and I again cancelled my travel and lodging arrangements. Mr. Kreisler's counsel subsequently asked that the training go forward on December 7, 2005, but I had already cancelled the arrangements and wanted to avoid expending additional time and expense until the Court addressed Mr. Kreisler's compliance with the Decree.

9. Because of the delays, I also had to cancel two training sessions with the sub-contracting fair housing organization in Minnesota, the Housing Discrimination Law Project, which was to conduct testing for fair housing violations at the subject properties. Because of the multiple cancellations and rescheduling, NFHA has incurred approximately $6,488.00 in unnecessary costs. Attached as Exhibit 6 is a true and correct copy of NFHA's accounting of costs.

10. In the last year, I have received three compliance reports – two from Marathon Management and the last one from Capital D, LLC (received in mid-December 2005). However, I did not review any reports until after the contract had been signed in September, 2005. It is NFHA's standard practice and industry custom not to undertake monitoring functions such as this until the housing provider has executed a contract providing for the payment concerning the

monitoring services. I informed Mr. Kreisler's counsel by letter of this on March 23, 2005, nearly 6 months before Mr. Kreisler executed the required contract. Attached as Exhibit 7 is a true and correct copy of that communication.

11. In October, 2005, I conducted my initial review of the first two compliance reports from Marathon Management and identified significant problems. For example, reports did not state the availability of units, dates of application, dates of action taken on applications, and reasons for denial of applications. They also omitted information about Mr. Kreisler's practices concerning repairs and renovations. The reports did not contain demographic information about publications in which advertisements were placed, and no copies of advertisements were provided. In addition, reports did not include direct tenant feedback that Mr. Kreisler had agreed to provide in the place of tenant interviews by NFHA. Moreover, they did not mention that Mr. Kreisler was transferring properties covered by the Decree to Penny Ream.

12. To date, NFHA still has not conducted any fair housing trainings and no fair housing testing at any properties covered by the Consent Decree. The initial fair housing training has been most recently rescheduled for February 28, 2006. I am still awaiting final confirmation from Mr. Kreisler's management company, Capital D, LLC.

13. The above is true and correct to the best of my knowledge.

Further Affiant Says Not.

Cathy Cloud

Cathy Cloud

Subscribed and sworn to before me this 9th day of February, 2006.

Cheryl D. Taylor

Notary Public



Cheryl D. Taylor
Notary Public State of Maryland
My Commission Expires March 1, 2006