**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Eboni SternJohn *et al,*

Plaintiff,

vs.

Robert L. Kreisler, Jr., *et al*

Defendants.

Civil File No. 82-842 (MJD/JSM)

**AFFIDAVIT OF PENNY REAM**

---

STATE OF MINNESOTA )
) SS.
COUNTY OF HENNEPIN )

**PENNY REAM**, being first duly sworn under oath, states and alleges as follows:

1. My name is **PENNY REAM**. I make this Affidavit of my personal knowledge and would so testify if called upon to do so.

2. I was formerly married to Robert Kreisler, one of the Defendants in this action. I was married to Kreisler from September 5, 1987 until August 18, 2004, when our marriage was dissolved in Hennepin County District Court.

3. During the time I was married, Kreisler employed me to do some administrative, bookkeeping and office work in connection with his rental real estate properties. During that time and since, I was not and have not been involved in any significant tenant-related or policy-making decisions relating to properties owned by Kreisler.

4. I have no knowledge of any of the particular facts or issues relating to this litigation, other than my general knowledge that the case involved allegations of discrimination housing.

5. I understand that my name was inserted in Paragraph IV of a Consent Decree on the eve of trial in this matter in late 2004. A copy of the Consent Decree is attached as Exhibit 1.

6. Paragraph IV of the Consent Decree, entered by the Court on December 8, 2004, incorrectly states that I was Robert Kreisler's spouse – which I had not been since August 18, 2004 – and further states that I am prohibited from "making any tenant-related decisions concerning" Kreisler's six properties, three of which were subsequently transferred to me as a result of the divorce.

7. The reason that the properties were conveyed to me was that they were the only significant assets that Kreisler owned that he could convey to me in order to satisfy his financial obligations to me as a result of the divorce. See Exhibit 2.

8. I was not aware that my name was included in the Consent Decree until middle to late December 2004, when Kreisler informed me that it was impossible for me to show apartments to any prospective tenants. I was employed by Kreisler at the time, as I had been during the marriage. I noted as a result of my bookkeeping role that there was an approximate one-third vacancy rate in Kreisler's apartments, commented (because I had a marital interest in the properties) that somebody had better start getting apartments

rented, and offered to do showings. It was at that time that Kreisler stated – and I first learned – that the Consent Decree prohibited me from making tenant-related decisions.

9. I did not give any approval or authorization to be included in the Consent Decree. I did not participate, directly or indirectly, in any of the negotiations leading to the agreement for the Consent Decree, nor was given any opportunity to do so.

10. The three properties that were transferred to me as part of the divorce are the only significant assets that I have derived thus far from my 17-year marriage to Mr. Kreisler. The transfer of those properties was negotiated at arm's length between my divorce attorney and Mr. Kreisler, who was unrepresented in the divorce. My attorney, Ronald D. Ousky, was not, to my knowledge, involved in the *SternJohn* litigation.

11. I have never been personally accused of, or charged with any discriminatory action in housing-related decisions during or since the time I was married to Mr. Kreisler.

12. My only income is that which I derive from operating the three properties that Kreisler conveyed to me as a result of the divorce. Barring me from making any tenant-related decisions would impose significant and substantial costs on the operation of the three rental properties. I would have no practical alternatives other than

(a) selling the properties, which I believe would be most disadvantageous in the current real estate market, or

(b) hiring a management company, which would typically charge a fee of 10 per cent of gross monthly rents plus an additional charge each time it rents an apartment (commonly $110 to $200 per rented unit). Because my properties have a very marginal cash flow, engaging a management company or other outside entity to control decision-making regarding tenant matters could result in a negative cash flow from those buildings.

The above is true and correct to the best of my knowledge.

Dated: July 13, 2006

By: s/ Penny Ream
**PENNY REAM**

Subscribed and sworn to before
me this 13th day of July, 2006.

s/ Margaret A. Johnson
Notary Public
Commission Expires: 1/31/08

418561