GARY A. WEISSMAN LAW OFFICE
Suite 300
701 4th Avenue South
Minneapolis, MN 55415
e-mail: gaw@minn.net
Fax: 612-333-9220

Gary A. Weissman
Attorney at Law
612-370-1110

Nancy M. Griffith
Paralegal
612-370-1112

June 8, 2005

Marshall Tanick, Esq.
MANSFIELD, TANICK & COHEN
200 So. 6th St. - suite 1700
Mpls., MN 55402

re: **SECOND OPINION**

**Applicability of the SternJohn vs. Kreisler Consent Decree to Penny Ream.**

Dear Mr. Tanick:

A. PRESENTING QUESTION: You have asked me to provide a written, "second opinion" on the following question:

*Is Penny Ream prohibited from managing (including making tenancy-related decisions) rental properties which she may be awarded incident to her divorce from Robert Kreisler?*

♦

B. **SHORT ANSWER**: Because of the facts and analysis in this Second Opinion, and subject to the disclaimer below, it is my professional opinion that the answer to the presenting question is "*No*:" The consent decree is not applicable to Ms. Ream; accordingly, the Consent Decree's proscription against Robert Kreisler's making tenancy decisions on the subject properties in Minnesota does not restrict Ms. Ream's right to manage properties adverted to in the Consent Decree of which she will become the Fee Owner (or to make tenancy-related decisions about them).

EXHIBIT
1

♦

## C. PREDICATES UPON WHICH THIS OPINION RESTS:

1. **DOCUMENTS:** I have reviewed the following documents:

a. Consent Decree: The 17-page Consent Decree negotiated and signed by counsel and the parties on December 6, 2004, and adopted by the federal district court for the district of Minnesota on December 7 (Magistrate Judge Mayron) and December 8, 2004 (Judge Davis), encaptioned *Eboni SternJohn and Julius SternJohn v. Robert Kreisler et al* ("SternJohn case").

b. Marital Termination Agreement (short form), signed on July 8-9, 2004, stipulating that the parties' agreements are accurately set forth in the Judgment and Decree. I refer to this document throughout the Second Opinion as "the MTA - short form."

c. Judgment and Decree, formally dissolving the marriage and apportioning the marital property between the spouses, Robert Kreisler and Penny Ream. The Judgment and Decree ("the J&D") was entered (i.e. became effective) on August 18, 2004.

d. Marital Termination Agreement (long form), which was signed by the parties and not submitted to the Court -- but adverted to in the MTA short form -- in order to iterate the values of the rental properties without making that information subject to public access under the Rules of Access to Records of the Judicial Branch. I refer to this document throughout this Second Opinion as "the MTA - long form).

e. Deposition Excerpts. Excerpts from the deposition of Penny Ream taken by an attorney for the U.S. Department of Housing and Urban Development ("HUD") on April 15, 2005.

2. **AS YET UNDOCUMENTED FACTS:** You told me that your client, Penny Ream is, through separate counsel, negotiating to amend the Judgment and Decree so that instead of her having liens against the seven rental properties, her ex-husband will transfer two of the properties to her in fee simple.

♦

**D. SALIENT FACTS.** The salient facts which underlie my analysis are set forth in the chart on the next page.

*Chart: Chronology of salient facts*

| CHRONOLOGY | FACT(S) | AUTHORITY |
|---|---|---|
| 1) 1987-2004 | During their marriage, Robert Kreisler ("Kreisler") and Penny Ream ("Ream") acquired seven rental properties, six in Minneapolis and one in Vernon Center (Blue Earth County), MN. | J&D, Findings of Fact, ¶IX. |
| 2) 1987-2004 | Although deemed marital property under the marital dissolution statute (Minn. Stat., ch. 518), the seven rental properties were evidently recorded as being owned by Kreisler (a/k/a Robert Peterson) or d/b/a Kreisler Real Estate Co., Whittier Real Estate Co., KT Properties Partnership, Whittier Community Apartments, or Bristol Apartments. | Consent Decree, caption. |
| 3) Apr. 22, 2002 | The Plaintiffs in the SternJohn case commenced their lawsuit against Robert Kreisler, alleging race discrimination in violation of the federal Fair Housing Act, the federal Civil Rights Act, and the Minnesota Human Rights Act. | Consent Decree, first paragraph |
| 4) July 8-9, 2004 | Kreisler and Ream signed the MTAs (both forms) | MTA - short form and MTA - long term. |
| 5) Aug. 18, 2004 | The Court adopted the parties' MTA - short form and formally dissolved the marriage | J&D, date of entry. |
| 6) Dec. 6-7, 2004 | The parties and attorneys signed, and the Court adopted the Consent Decree. | Consent Decree, signature pages. |
| 7) Apr. 15, 2005 | HUD attorneys deposed Penny Ream. | Deposition, pp. 28,35,53-54, 101-103 |
| 8) Spring, 2005 | Kreisler and Ream negotiate amendments to the J&D | SOURCE: Marshall Tanick |

♦

## E. ANALYSIS.

1. SCOPE OF THE CONSENT DECREE: The Consent Decree, which remains in force through December, 2009, requires, *inter alia*, that:

a. Posting of the Consent Decree at each of the "Minnesota rental properties;"[1]

b. Training of employees, agents, and new hires in both fair housing and diversity (¶VI);

c. Anti-discrimination policy. ¶VII of the Consent Decree required Kreisler to adopt a comprehensive, anti-discrimination, anti-harassment, and anti-retaliation policy, the terms of which were spelled out in an attachment to the Consent Decree (**Attachment A**);

d. Affirmative marketing in newspapers that cater to communities of color (¶VIII);

e. Compliance reporting on a quarterly basis to the SternJohns' counsel and to the National Fair Housing Alliance (¶IX);

f. Independent Management. ¶V requires Kreisler to contract with an independent management company to handle "tenancy-related decisions" concerning *all* of Kreisler's "Minnesota rental properties."[2]

g. Removal of operational authority. **Paragraph IV** is the only provision in the Consent Decree which mentions Penny Ream. It is set forth here in its entirety:

> "Upon full execution of the Consent Decree and for the life of the same, Defendant Robert Kreisler *and his spouse, Penny Ream*, shall be prohibited from making any tenancy-related decisions concerning any Minnesota rental properties, including, *but not limited to*, whether to approve or reject a tenant

---

[1] Paragraph III of the Consent Decree requires posting "in a prominent location at *each and every one of Defendants' Minnesota rental properties* for the life of the Consent Decree." The Consent Decree itself (¶II) iterates six rental properties, all in Minneapolis. The J&D, however, at ¶IX(G) of the Findings of Fact, mentions a seventh rental property at 203 Poplar Street in Vernon Centre, Minnesota. The reason for the discrepancy is beyond the scope of this Second Opinion.

[2] *See* fn 1.

application and whether to end or not end a tenant's lease. Defendant Kreisler *and Ms. Ream* may have continuing involvement in the capital maintenance issues for the properties covered by this Consent Decree consistent with the management agreement to be executed and subject to Court review and supervision." [emphases added].

*

2. APPLICABILITY: The Consent Decree (¶II) states that

*The Consent Decree does* <u>*NOT*</u> *run with the aforementioned properties; therefore, if Defendants sell or transfer any such property via an arms-length transaction with an unrelated third party, the Consent Decree will no longer apply to that legitimately sold or transferred property* [emphasis added].

*

**3. DISPOSITION OF THE RENTAL PROPERTIES:** The J&D (**¶8 of the Conclusions of Law**) awarded ALL of the rental properties to Kreisler, subject to a lien in one-half of the equity in each rental property. Until her liens are satisfied, she is entitled to participate in the management of the properties and to realize 50% of the net cash flow from the operation of the properties.

*

**4. ISSUE:** Which, if any, of the provisions of the Consent Decree would apply to Ms. Ream if and when her family law attorney and Mr. Kreisler[3] consummate their negotiations to amend the J&D by transferring two (or three?) of the seven rental properties to her in Fee Simple Absolute?

*

**5. SUBSIDIARY QUESTIONS:** In order to resolve the issue, one must answer the following subsidiary questions?

**a)** Was Ms. Ream a party to the Consent Decree?

**b)** Can the Consent Decree bind her, by specifically listing her and imposing restrictions upon her, even if she were not a party?

---

[3] Kreisler was *pro se* during the marital dissolution and may or may not retain counsel for the post-decretal amendments.

c) Does she fall within the ambit of a "related third party" (in terms of ¶II of the Consent Decree)?[4]

d) Would a post-decretal transfer of property from Kreisler to Ream be deemed an "arms-length transaction"?

*

6. DISCUSSION: I answer all four questions in the negative:

a. <u>Party</u>: Ream was not a party to the Consent Decree. She was not asked to sign, nor did she sign, the Consent Decree. Although the Consent Decree consistently refers to the Defendant in the plural ("the defendants"), the defendants, so listed by the Plaintiffs, are all iterations of Robert J. Kreisler, Jr. or of his business entities.[5] Evidently four of the business entities listed as defendants were/are sole proprietorships owned by Kreisler and the fifth, KT Properties Partnership, was an entity of which Kreisler was the General Partner but of which Ream was not a partner.[6] Ream had no ownership interest in any of those entities -- except potentially during coverture.

**THEREFORE**, *she was not a party to the Consent Decree.*

**b.** <u>Binding</u>. Under general contract principles, a party who is neither listed as a party nor a signatory to that contractual agreement cannot be bound by a contract between the parties who are signatories, *Rockney v. Pako Corp.*, 734 F. Supp. 373, 381 (D. Minn. 1988) -- unless that third party is in privity with the promisor, *S.E.C. v. O'Hagen*, 901 F. Supp. 1476, 1478 (D. Minn. 1995). To be sure, **Rule 65(d), FRCP**, enjoins not only parties but "their agents, servants, employees...and upon those persons in active concert or participation with them who receive actual notice of the order...;" and one might reasonably construe the non-monetary provisions of the consent Decree as injunctive in nature.

Nevertheless, Ream can hardly be deemed as in privity with, as an agent of, or as acting in active concert with Kreisler because the key facts are that **(i)** she was never a shareholder or partner in any of the business entities which own[ed] the properties **(DEPO: P.**

---

[4] *See* ¶E(2), *supra*.

[5] He is listed as having had two other names (Bob Peterson and Robert Peterson) and as d/b/a in five non-corporate names (Kreisler Real Estate, Whittier Real Estate, KT Properties, Whittier Community Apartments, and Bristol Apartments).

[6] J&D, Findings of Fact, ¶XI.

28:1-9); and (ii) she was NOT married to him when the Consent Decree was executed (J&D). She, in fact, had been divorced from him for four months. The Consent Decree *erroneously* characterizes her (in ¶IV as Kreisler's spouse).[7]

**THEREFORE**, *the Consent Decree was not binding upon her.*

Perhaps even more critically, the purpose of the equitable provisions of the Consent Decree is to ensure that discriminatory practices which occurred in the past will not occur in the future. A third party tenancy manager is a reasonable remedy to preclude a return of the very discriminatory practices that prompted the Consent Decree. However, it is not reasonable to impose such a remedy on someone who had no role in the discriminatory conduct. Ms. Ream's deposition testimony is that she never had any role in selecting tenants, in doing background checks on applicants, in deciding whose units were to be renovated, in evicting tenants, or even in communicating with tenants **(DEPO, pp. 25:15-16; 53:1-21; 54:3-15; 101:18-23; 102:10-25,** and **103:1-10)**.

**THEREFORE**, ***the Consent Decree should NOT be binding upon her, even if she were deemed his "agent" before the divorce.***

**c.** Related third party. "Related" means "allied by nature, origin, kinship, or marriage." *Webster's Encyclopedic Unabridged Dictionary of the English Language* (2001) at 1626. Ream could not be a near-relative of Kreisler's by blood, or she could not have married him in 1987. **Minn. Stat. §517.03, subd. 1.** And she was no longer "related" to him by marriage upon the entry of the Judgment and Decree dissolving the marriage in August, 2004. "A decree of dissolution completely terminates the marital status of both parties." **Minn. Stat. §518.06.**

**THEREFORE**, ***Ream was not related to Kreisler in December 2004, and, accordingly, falls within the ambit of "unrelated third party."***

**d.** Arms-length transaction. Here, the parties are adjusting a property division made at the time of the divorce. Kreisler had been awarded 100% ownership of the seven rental properties, and Ream had been given liens against all seven until Kreisler paid her in full. Ream was required to execute deeds by

---

[7] Whether, *vel non*, the attorneys and the Court were aware of the dissolution is immaterial. Kreisler, having signed both MTAs, was certainly aware of the dissolution. Legally, she had nothing more than a lien interest in those rental properties in December, 2004, when Kreisler, the plaintiffs, the parties' attorneys, the Magistrate Judge, and the Judge all signed the Consent Decree.

August, 2004, conveying all of the rental properties to Kreisler, subject only to her liens (¶7, Conclusions of Law of the J&D). The inchoate amendments to the J&D will merely adjust the arrangement so that Ream would be awarded some of those rental properties in fee simple absolute,[8] thereby divesting Kreisler of ownership in those properties transferred to her and divesting Ream of her liens against the residual properties remaining under Kreisler's ownership. The Eighth Circuit has held that transfers incident to a divorce are "akin to negotiated, arms-length transactions," *Meisner v. United States*, 133 F 3d 654 (8th Cir. 1998).

**THEREFORE**, *the post-decretal transfer of some of the rental properties to Ream, re-arranging but maintaining the apportionment of the value of those properties between the divorced spouses would be an arms-length transaction.*

*

7. **UPSHOT**. Because Ream was neither a party nor a signatory to the Consent Decree, because it was not binding upon her (despite her having been named in one paragraph), because she is not a relative or Kreisler (nor was she at the time of the execution of the Consent Decree), because she had no role in the discriminatory conduct which the Consent Decree was adopted to remediate, and because any post-decretal transfer to give Ream *some* of the rental properties in fee simple absolute would be an arms-length transaction, the only provision of the Consent Decree binding upon Ream is the provision binding on any owner of rental property -- she is subject to the Fair Housing Act, the federal Civil Rights Act, and the Minnesota Human Rights Act.

**HENCE,**

- SHE NEED NOT HIRE AN INDEPENDENT COMPANY TO PERFORM TENANCY-RELATED FUNCTIONS,
- NOR DOES SHE NEED TO POST COPIES OF THE CONSENT DECREE,
- NOR DOES SHE HAVE TO TRAIN STAFF SHE MAY HIRE,
- NOR DOES SHE HAVE TO AFFIRMATIVELY MARKET IN NEWSPAPERS WHICH CATER TO COMMUNITIES OF COLOR.

♦

---

[8] The properties are not all of equal value. Their total value, according to the MTA - long form, ranges from $2.8M to $3.6M; accordingly, if the properties to be transfered to Ream were worth approximately half that amount, it would be an arms-length transaction.

F. MY BACKGROUND:

^ I have been a member of the Minnesota Bar since 1977 and a member of the federal (Minnesota) district bar since 1979.

^ My practice has been principally concentrated in three areas: family law, employment law,[9] and data privacy. <This Second Opinion addresses issues at the hinge of employment law and family law>.

^ As an employment law attorney, 95% of my clients have been plaintiffs, and my practice has been primarily on behalf of civil rights and False Claims Act plaintiffs. I am a member of the National Employment Lawyers Association ("NELA").

^ As a family law attorney, I am an officer ("Transformation Coordinator") of the Minnesota Chapter of the American Academy of Matrimonial Lawyers ("AAML") and a former chair of the Family Law Section of the Minnesota State Bar Association. I am also an attorney-member of the family law faculty of the Minnesota Judicial College. Also relevant, because the Kreisler-Ream divorce was evidently conducted collaboratively,[10] is that I am a member of, and a former Board Member of, the Collaborative Law Institute.

^ Additionally, I have over the years increasingly shifted the proportion of my work time that I devote to alternative dispute resolution, giving me a perspective from the vantage of a neutral. I have trained mediators (under the auspices of the Supreme Court of Minnesota, of the Mediation Center [Hamline University], and of the Center for Conflict Management [William Mitchell College of Law], and I have trained arbitrators for both the Mediation Center and Minnesota CLE. I am an Associate of the International Academy of Mediators and the Editor of the ADR Desk Book for Minnesota Continuing Legal Education; I sit on the supreme court's ADR Review Board; and I have taught Alternative Dispute Resolution as an

---

[9] I am one of three attorneys in Minnesota who attend both the annual Family Law Institute and the annual Employment Law Institute: We three are the only ones, apparently, who recognize a practice connection between the law of where people live and the law of where people work.

[10] There is a dispute resolution clause (¶2 of the Conclusions of Law) in the J&D which adverts to collaborative law; they are listed as co-Petitioners in the MTA, meaning that they filed a Joint Petition **(Minn. Stat. §518.09)**; and Ream's attorney, Ron Ousky, a former president of the Collaborative Law Institute, had announced in the spring of 2004 that he was no longer accepting non-collaborative clients.

adjunct professor at William Mitchell College of Law since 1993. My own ADR practice tends to be in substantive areas in which the attorneys who hire me believe that I have expertise, namely family law and employment law.

♦

G. DISCLAIMER: I am providing a Second Opinion about this issue to Ms. Ream's attorneys at MANSFIELD, TANICK & COHEN. I cannot guarantee that the federal court will adopt my opinion, should the issue be litigated, nor should Ms. Ream be induced to rely on my opinion.

However, given the facts and my analysis of those facts, the most reasonable conclusions to be drawn from the Consent Decree -- read together with the Judgment and Decree dissolving the Kreisler-Ream marriage -- is that Penny Ream (who, at the time of the execution of the Consent Decree was divorced from Robert Kreisler and had only lien interests in Kreisler's rental properties [not substantively different from those of mortgagees]) will not be bound by the strictures of that Consent Decree if, in fact, she and Kreisler amend their Judgment and Decree to convey to her in fee simple absolute some of the seven rental properties awarded by that divorce decree to Kreisler.

Respectfully submitted,

Gary A. Weissman