UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

Plaintiff,

vs. *Civil No. 03-3599 (MJD/JSM)*

Robert L. Kreisler, Jr., a/k/a Bob Peterson; Kreisler Real Estate Company; Whittier Real Estate Company; and Whittier Community Apartments,

Defendants.

---

COPY

DEPOSITION OF PENNY REAM

Taken on April 15, 2005

11:29 A.M.

REPORTED BY: Janet D. Winberg, RPR

EXHIBIT 3

DEPOSITION of **PENNY REAM,** on the 15th day of April, 2005, commencing at 11:29 A.M., at the offices of Mansfield, Tanick & Cohen, 1700 Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota, before Janet D. Winberg, Registered Professional Reporter, a Notary Public in and for the County of Washington, State of Minnesota.

**A P P E A R A N C E S:**

**On Behalf of the Plaintiff:**
Elise S. Shore, Esq.
Michalyn Steele, Esq.
Gabriel Katsh
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW
Northwestern Building, 7th Floor
Washington, DC 20530

**On Behalf of the Defendants:**
Angela Beranek Brandt, Esq.
Larson * King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota 55101

**On Behalf of Penny Ream:**
Marshall H. Tanick, Esq.
Mansfield, Tanick & Cohen, P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402-4511

unlikely that you won't be able to hear me, but if you don't understand something I say, please ask me to rephrase it Or if you don't understand a particular word I use, I'll be happy to, you know, explain that for you; okay?
A. **Sure.**
Q. And then, also, when responding to my questions it's important that you say *yes* or *no* so that the court reporter can accurately reflect what your response to my question is; okay?
A. **Yes.**
Q And if you need to take a break at any time, that's fine, just let us know.
A. **And we just ask that if a question is pending, you take the break after you answer the question and you respond to the question before taking the break.**
Also, if your attorney states an objection, if you can just wait for him to state his objection for the record and then answer the question, unless he instructs you not to do so; okay?
A. **Yes.**
Q. All right. Ms. Ream, have you ever testified in a court case at all?



A. **No.**
Q. Okay. So this is your first experience?
A. **Yes.**
Q. Okay. Have you ever been a party to a lawsuit?
A. **No.**
Q. Okay. And you've never been a witness in a case?
A. **No.**
Q. Okay. Are you aware of the allegations in this lawsuit, United States versus Kreisler?
A. **In general terms.**
Q. Okay. And what -- basically what's your understanding of the case?
A. **It's a racial discrimination case.**
Q. Okay. And how did you become aware of the lawsuit -- our lawsuit?
A. **Um...**
Q. If you can remember.
A. **Yeah. When the SternJohns first -- whatever you do, put forth their complaint. I do know that there was a parallel complaint with the Justice Department. And so -- let's see. Then I believe -- my understanding is that was sort of put on hold. And then I think it was probably spring or summer of probably 2003 when**



**Mr. Edwall, who was Robert's attorney at the time, notified him that he'd received papers.**
Q Okay.
A **I think. To the best of my knowledge that's the situation.**
Q Okay.
MS BRANDT: Could I ask you to speak up a little bit?
THE WITNESS: Oh, yes.
MS BRANDT: I know it's hard, but I can't hear you very well down here.
THE WITNESS: Oh sure.
MS. BRANDT: Thank you.
THE WITNESS: You're welcome.
BY MS. SHORE:
Q. Ms. Ream, do you understand that the United States has not alleged that you have violated the Fair Housing Act?
A. **Yes.**
Q. And that you're not a party to this lawsuit?
A. **Yes.**
Q. Okay. And that basically you're here today as a potential witness or observer of events that underlie our lawsuit and not because we have alleged wrongdoing on your part; do you understand that?



A. **Yes.**
Q. Okay. Have you discussed your testimony today with anyone?
A. **Yes.**
Q. And who would that be?
A. **Mr. Tanick.**
Q. And how much -- well, let me back up. Strike that.
When did you meet with Mr. Tanick?
A. **That would be yesterday.**
Q. Was that the only time? Or were there other times?
A. **Regarding the deposition?**
Q. Yes.
A. **Yesterday was the only time.**
Q. Okay. And did you review any documents?
A. **Yes.**
Q. And if I can just ask which documents you reviewed, if you can remember.
A. **I think there were two or three -- like interrogatives.**
Q. Oh, okay.
A. **And I believe a copy of the *Complaint* was there.**
Q. Okay. And have you ever met with Mr. Kreisler's

Page 25

three times a week.
Q. And how often do you think you talk to him, if you don't see him, like on the phone?
A. **We probably talk five times a week.**
Q. Okay. I'm going to move, to ask you a few questions about Kreisler Real Estate Company.
A. **Okay.**
Q. Okay?
A. **Uh-huh.**
Q. Ms. Ream, what is Kreisler Real Estate Company?
A. **I don't know what you mean.**
Q. Well, let me ask you it this way: Could you describe your involvement in Kreisler Real Estate Company?
A. **Sure.**
I am basically a clerical person who processes the mail, some communications. Collect -- I don't collect the rent. The rent comes in in the mail. I record the rent and make bank deposits. I oversee the processing of bills. Make sure the bills -- checks get -- checks get cut to pay the bills and put them in the mail. That pretty much capsulizes it.
Q. Okay. And we understand from Mr. Kreisler that at some point Kreisler Real Estate Company

Page 26

changed to Whittier Real Estate.
A. **Correct.**
Q. Did your duties pretty much remain the same with that transition?
A. **Yes.**
Q. Okay. And at what point did you become involved in your capacity as -- what you labeled a clerical person? At what point in time, if you can remember, did you become involved with Kreisler Real Estate as a clerical person?
A. **We're in 2005, aren't we? That's a -- I'm not sure I can answer that --**
Q. Okay.
A. **-- very specifically.**
Q. Let me explain a little to you. We're here basically about -- the case is basically about two properties--2500 Blaisdell and the 2421 Pillsbury property.
We understand, based on Mr. Kreisler's testimony, that Kreisler Real Estate, the entity, may have existed before he purchased those properties. So my question to you is: Were you involved with Kreisler Real Estate before Mr. Kreisler purchased the 2500 Blaisdell and 2421 Pillsbury properties, if you can

Page 27

remember?
A. **Yes.**
Q. Okay.
A. **Yes.**
Q. For how long do you think you might have been involved with that entity before he purchased those properties?
A. **(No response.)**
Q. Again, if you can remember.
A. **Yeah. Again, I don't believe I can put a specific date on it --**
Q. Uh-huh.
A. **-- because over -- I was working my own work outside the home, but at some points, you know, it's like -- "Oh, these envelopes need stamps. I will put stamps on the envelopes." So that over a period of time I did the small task, that small task.**
Q. So is it fair to say you sort of started out as pitching in?
A. **Correct.**
Q. And then what happened?
A. **Pitching in and -- it grew.**
Q. Okay.
A. **Yeah.**

Page 28

Q. Now were you also a general partner in Kreisler Real Estate?
A. **No.**
Q. Okay. Did you have any interest in the entity Kreisler Real Estate?
A. **No.**
Q. Okay. And what about Whittier, were you at all a partner or are you a partner in Whittier?
A. **No.**
Q. Okay. Have you ever received any kind of share of profits from Kreisler Real Estate?
A. **What do you mean by share of profits?**
Q. Let me ask you this --
(Outside interruption.)
MS. SHORE: Oh, if we can take a break. There's --
Just go off the record for a minute, please.
(Off the record.)
MR. TANICK: Continue.
MS. SHORE: Okay.
BY MS. SHORE:
Q. Have you ever derived -- let me ask you this -- an income from Kreisler Real Estate?
A. **I still need you to clarify that one.**
Q. Have you ever been compensated for the work

Q. Okay.
A. -- would be taking possession of their apartment.
Q. I'm going to go back in time again and focus a little on Kreisler Real Estate And as I explained earlier, our lawsuit is really just involving the two properties at Blaisdell and Pillsbury -- 2500 Blaisdell and Pillsbury; okay?
A. Sure.
Q. Could you describe where the Kreisler Real Estate office was located after Mr Kreisler bought -- well, let me back up
After Mr Kreisler made a deal with Mr. Hopfenspirger to purchase those properties?
A. (No response.)
Q. Did you understand the question?
A. One more time, please.
Q. Yeah, let me rephrase that.
A. Thank you.
Q. Could you just tell us where the office -- the sort of Kreisler Real Estate office was located after Mr. Kreisler purchased the 2500 Blaisdell and 2421 Pillsbury properties? And when I say "purchase," I mean after he became essentially manager of the properties.



A. Those are two separate things. Do you want when he became owner of the properties?
Q. Let's start with manager.
A. Hmmmm.
Q. And I can give you --
A. For a period of time --
Q. Yeah.
A. -- the office was at 121 West Elmwood Place.
Q. And can you remember when that was?
A. I do not recall when the office moved to 2500 Blaisdell.
Q. But at some point --
A. Suite 500.
Q. I keep interrupting. I'm sorry.
2500 Blaisdell, suite what?
A. 500.
Q. But at some point in time the office moved?
A. Correct.
Q. Okay.
A. Correct.
Q. When the office moved to 2500 Blaisdell what type of hours did you keep at that office?
A. I was working eight, ten, fifteen hours a week.
Q. And what hours was the office open?
A. The business office?



Q. Yes.
A. It varied.
Q. Okay. What -- it would vary according to what?
A. There would be two offices. There was also a rental office on first floor.
Q. Okay. Why don't we talk about the business office first. Can you tell us a little about that office in terms of the hours? You said they varied; what do you mean by that?
A. I worked in the business office, the hours would vary when I was in the office.
Q. Would the office be open when you weren't there?
A. No.
Q. Okay. How would you determine when the office would be open?
A. Generally it would be open in the mornings because the mail comes and the work would be there. But there's some flexibility to that.
Q. Would the office ever be open in the afternoon?
A. I don't recall.
Q. Okay. And who else, other than yourself, would be working in the business office when it was open?
A. Mr. Hiller would be.
Q. Anyone else?



A. At times -- what time frame are you asking about?
Q. That's a good question. Let's start with when Mr. Kreisler took over the properties in, say, November of 1998. And let me back up and just define -- at that point in time, in November '98, was there an office at 2500 Blaisdell, --
A. No.
Q. -- if you can remember?
A. (Shaking head.)
Q. If you can remember, either a time of year or a month, when did the office open at the Blaisdell property?
A. Let me clarify.
There was not a business office at 2500 Blaisdell.
Q. In November of 1998?
A. Correct.
Q. Okay.
A. The business office.
Q. Okay. When did that office open, the business office, in the 2500 property, can you recall?
A. I don't recall.
Q. Okay.
A. Maybe spring of the next year. I don't recall.

your question.
Q. In your capacity as sort of the office person for Kreisler Real Estate --
A. **Correct.**
Q. -- did you ever cut checks for a rental agent?
A. **As in Nancy Nelson?**
Q. Yeah.
A. **We utilized Pay*checks* -- payroll service paychecks.**
Q. What's the name of that service?
A. **Pay*checks*.**
Q. Oh, okay. Did Kreisler Real Estate cut any checks for Kreisler Real Estate employees?
A. **Yes.**
Q. Who would that be?
A. **Kreisler -- we did cut checks for Reuben Perez. Mr. Perez now receives his checks through *Paychecks*. We made a transition.**
Q. How about Mr. Pietrzak?
A. **No. That would have been processed through --**
Q. Okay.
A. **-- through Pay*checks*.**
Q. Anyone else other than Mr. Perez -- I'm sorry -- Perez?
A. **Perez.**



Q. Perez.
A. **Well, let me see. There were other people who probably were temporary employees that I can't recall.**
Q. And the --
A. **And --**
Q. Oh, I'm sorry.
A. **You did extend this beyond -- those were not rental agents.**
Q. Correct.
A. **Okay. Yes.**
Q. How about -- oh, strike that.
Before the office moved to 2500 Blaisdell how involved were you with visiting the actual properties that were managed by Kreisler Real Estate?
A. **Not involved.**
Q. Did you ever visit any of the properties before you moved into the -- before the office moved from 121 West Elmwood Place to 2500 Blaisdell?
A. **Which properties?**
Q. Any of the properties that Kreisler Real Estate was involved in managing.
A. **I probably did, yes.**
Q. Can you recall any of them?



A. **Oh. I probably -- I know I visited 2124 Garfield. I know I have been in 424 West 24th Street. I know I have been in the 123 through 131 West 26th Street. That would be it. Well, that's it.**
Q. Okay And why would you have visited those properties?
A. **Simply as Robert's spouse, going to the property when he went to the property.**
Q. Okay. So it wasn't really in your capacity as --
A. **Correct. Correct.**
Q. And this question is going to apply to both when the office was located at West Elmwood Place and then after it moved to 2500 Blaisdell. Was -- well, you know what? Strike that. Let me start with the West Elmwood Place.
When the office was located at West Elmwood, to what extent was there an office manual governing procedures for managing Kreisler Real Estate properties?
A. **I don't believe there was.**
Q. Okay. And how about when the office moved to Blaisdell, was there sort of an office manual that helped guide how properties would be



managed from that office?
A. **I don't know -- I don't believe so.**
Q. Okay.
A. **Excuse me.**
Q. And at any time -- well, let me strike that.
Once the office moved to 2500 Blaisdell what was your role in developing any kind of policies or procedures for managing the Kreisler Real Estate properties?
A. **I did none.**
Q. Who would have developed policies or procedures for managing Kreisler Real Estate properties?
A. **Mr. Kreisler.**
Q. Okay.
Okay. Ms. Ream, I'm going to get -- I'm going to get a little more specific with some of the procedures.
A. **Okay.**
Q. And, again, to the best of your ability, --
A. **All right.**
Q. -- what you can answer.
I realize it was a while ago. And we don't want to make this difficult for you.
A. **Thank you.**
Q. Okay. I wanted to ask you a little about the

application procedures.
A. **Yes.**
Q. Okay. Were their records kept as to phone calls that people would make for vacancies? And now -- well, you know what? Let me back up.
When the office was in West 1 -- 121 West Elmwood Place, did that office receive phone calls from tenants in the Kreisler Real Estate properties?
A. **Yes.**
Q. Okay. And at that point to what extent were their records kept as to phone calls made to that office? Phone calls -- let's say, for example, for people inquiring about apartment availabilities?
A. **The telephone message would be written down.**
Q. Was it a log? Or --
A. **No.**
Q. Okay. And how about at that point -- strike that.
Once the office moved to the Blaisdell property, to what extent were the records kept as to phone calls for, you know, availability as to apartments?
A. **Once we moved there...**



I don't know the time frame on it, but there are records kept -- but there's now a phone log. I don't know when that was --
Q. Okay.
A. **-- initiated.**
Q. Initiated?
A. **Correct.**
Q. Okay. Now earlier you talked about the rental office. Did that office have a separate phone number that people could call into?
A. **I don't recall back then. There is currently, yes, but I don't know when that happened.**
Q. Okay. And that rental office still exists at 2500 Blaisdell?
A. **Definitely, yes.**
Q. Okay. Does that rental office deal with other Whittier properties, or just the 2500 Blaisdell properties?
A. **All Whittier properties.**
Q. Okay. And again I'm looking now mainly at the application procedure.
A. **Uh-huh.**
Q. If somebody actually came in to the office, and obviously this is when it was located at 2500 Blaisdell, and asked for an apartment, --



A. **Okay.**
Q. -- or was looking for an apartment, would that transaction be recorded?
A. **I would not be involved in that, so I can't really respond to that.**
Q. Okay. So who would be involved in that?
A. **Currently, Marathon Management.**
Q. And when Mr. Kreisler took over, say for example, after he took over in January of 1999 and thereafter, who would have been involved in it?
A. **Mr. Kreisler.**
Q. Okay. To what extent were you involved in the application process?
A. **I was not.**
Q. And who was responsible for taking rental applications?
A. **In what time frame?**
Q. I'm sorry. First of all, when the office was located at West Elmwood, who was responsible for taking in rental applications?
A. **Mr. Kreisler.**
Q. And how about once the office moved to 2500 Blaisdell?
A. **Mr. Kreisler.**



Q. Was there anyone else ever involved in the rental application process?
A. **Ms. Nelson.**
Q. Okay. Do you have any sense of what the application procedures involved?
A. **A general sense.**
Q. And could you tell us what that is?
A. **There's an application form, an application itself.**
Q. Anything else?
A. **There's a release that needs to be signed for credit. Background check and rental history check. And that's my general knowledge.**
Q. Were you involved at all in handling any application-type papers?
A. **What time frame?**
Q. I'm sorry. When Mr. Kreisler took over the properties in 1998, November of 1998, up to 2001.
A. **And the question?**
Q. Okay.
A. **The time frame and now the question, please.**
Q. Now the question is what was your role in handling any type of application --
A. **Oh.**

Q. -- papers in that time period?
A. **Okay. They would -- yes. Applications processed would come to my desk if it was -- and then they would be filed. You know, if it was an application that was approved, I would handle entering them -- entering the new residents and whatever information we needed and they go into the active file.**
Q. Now when those papers came to you, --
A. **Uh-huh.**
Q. -- what, if anything, did you have to do to process the papers?
A. **To process the papers?**
Q. The application papers.
A. **To the best of my recollection, nothing, other than put them in a filing cabinet.**
Q. Okay. You mentioned earlier there were background checks conducted.
A. **I believe -- yes, I do --**
Q. Who did that?
A. **Mr. Kreisler.**
Q. Was there anyone else that you know of who was involved in the background check process?
A. **In that time frame?**
Q. Yes.



A. **That same time frame?**
Q. Correct.
A. **No. He utilized a service, but --**
Q. I'm sorry.
Do you know the name of that service?
A. **To the best of my recollection that would be *Landlord Protection*.**
Q. Who had the final authority to decide whether an applicant would be accepted as a tenant?
A. **Mr. Kreisler.**
Q. When you were in the process of collating these papers, the applicant intake papers let's call them, did you ever have occasion to actually look at the credit --
A. **No.**
Q. Um --
A. **Not that I recall.**
Q. Okay. And to what extent did you record or take note of any applications that Mr. Kreisler rejected?
A. **Repeat, please.**
Q. In the same time frame, --
A. **Correct.**
Q. -- did you record or were you responsible for recording applicants that were rejected?



A. **I'm trying simply to recall -- I believe that I probably processed a letter that would say, you know, that was, "Thank you for applying and we are returning your check."**
Q. Can you recall the -- would the letter state any reason why they would have been rejected?
A. **That person -- the applicant would have already spoken with a representative, Mr. Kreisler. And so I believe the letter was along the lines of, "Thank you for applying for the apartment. Your application has been declined for the reasons stated to you. Enclosed please find your voided check."**
Q. Who would have drafted that letter?
A. **Mr. Kreisler.**
Q. What was your role in sending out that letter?
A. **Sending it out.**
Q. So who would actually type it up and print it out?
A. **I did.**
Q. Okay. Did he -- I know I'm getting very detailed, but did he actually type the letter, or you would type the letter?
A. **I would type the letter.**
Q. Did he dictate it to you or did he give you a



written draft?
A. **It became a form letter.**
Q. Okay. And can you describe the process of how it became a form letter?
A. **I will try.**
Q. If you can.
A. **At some point that type of letter was first written, drafted, it became, "Here's another application. Here's the letter we used before, let's use this letter again."**
Q. Okay.
A. **Just...**
Q. And you mentioned earlier that prior to receiving this letter, the rejected applicant would have been contacted by a representative of Kreisler and then you said Kreisler?
A. **Correct.**
Q. Was Mr. Kreisler personally involved with talking to rejected applicants?
A. **Yes.**
Q. Okay.
A. **In that time frame, yes.**
Q. Okay. Was anyone else involved in that process that you know of?
A. **Not that I'm aware of.**

Page 65

A. **I said that was one idea that I had, --**
Q. Okay.
A. **-- one opinion I would have.**
Q. And my follow-up question to that is did you ever have a time when you were involved with Kreisler Real Estate where there was a problem with the checks being taken from a location or something to that effect?
A. **No.**
Q. Okay. Let me ask you -- when you were at Kreisler Real Estate, and we're going to talk again about the time frame from November 1998 to about January of 2001, how were the rents determined?
A. **I was not involved in that.**
Q. Based on your -- well, let me back up.
I'm going to ask you a few questions about the rent rolls first. Earlier you testified about -- again, talking about Kreisler Real Estate and I'm going to define the period. And hereinafter when I talk about the procedures, I'm going to be referring to the time period that covers November 1998 to January 2001.
A. **Okay.**

Page 66

Q. And for that time period what was the procedure for recording monthly rents?
A. **At that point -- well, open the envelopes, sort them by property and record them in the rent roll.**
Q. I'm sorry. The first part I didn't hear you.
A. **Sure.**
**Open the envelope, sort the checks/money orders, by property. And then record them on the rent roll in terms of the amount of money that came in and the date.**
Q. Okay. And going back -- opening -- you said opening the envelopes. Again, where would the envelopes come to? Let's say from November '98, when the office was located at 121 West Elmwood Place, --
A. **Correct.**
Q. -- where would the envelopes come to -- the rent envelopes come to?
A. **They were mailed to a post office box.**
Q. Who was responsible for picking them up from the post office box?
A. **Predominantly I did.**
Q. Who else?
A. **Gee, I imagine Robert might have --**

Page 67

Q. Okay.
A. **-- sometimes.**
Q. And then once the office -- the Kreisler Real Estate office was moved to 2500 Blaisdell, who was responsible for picking up the rent checks to the post office box?
A. **Predominantly I would be.**
Q. Okay. Anyone else?
A. **Again, if I were ill, out of town. To the best of my knowledge, probably Robert.**
Q. Okay.
A. **Mr. Kreisler.**
Q. And then you said opening up the envelopes --
A. **Correct.**
Q. -- and recording them on the rent roll.
A. **Correct.**
Q. Could you just tell us what that involved in terms of the actual recording of the rents paid?
A. **Well, the rent roll has a column that says something along the lines of *Dollars Received, Date.***
Q. Uh-huh.
A. **And one would look at the check, see how much the check was for, the appropriate apartment and resident. Write in that square the amount of rent received and put the date down.**

Page 68

Q. Okay. And was this done manually or by computer? And first I'm going to talk about the November '98 period, when the office was in the West Elmwood Place address. Was that done manually or through a computer, the rent roll?
A. **Well, we were in transition. Most of the properties were done by hand. I do believe, if my recollection is accurate, that the two properties at 2421 and 2500 were on a computer because Mr. Hiller had done that previously.**
Q. Okay. Would you enter the rent roll data on to a computer for those properties?
A. **I believe Mr. Hiller did that for a -- because he had the computer knowledge at that point.**
Q. And that would be for the time period from November '98 until the --
A. **There was a transition in there. And I know that we -- we were also switching computer systems and we created a new rent roll and I don't know time frame.**
Q. Was that after Kreisler Real Estate moved its office to 2500 Blaisdell?
A. **It was all in process. I couldn't -- I couldn't give you an exact -- you know, we're going back**

**would -- that would be -- yes.**
Q. Okay And just a few small questions
On the third page of the document package, ending in Bate stamp 90, last two digits of the Bate stamp, if you look at the third column there's two asterisks What are those representing, if you know?
A. **Oh boy.**
Q. If you can remember
A. **I don't remember.**
Q. Okay. And how about the next page, ending in 91, --
A. **Uh-huh.**
Q. -- if you look at the third column there's an "LM"; can you remember what that is?
A. **Last month of residency.**
Q. Okay. And what about -- if you move over about three columns there's a dollar figure, "VER dash okay"; what does that mean?
A. **"Dollars verified--okay."**
Q. And what is that? What do you mean, "Dollars verified--okay"?
A. **The last month of residency, we would use Merchant Verification to verify that funds were available on the last rent payment that was**



**submitted.**
Q. Okay. So what did that process involve?
A. **Calling the bank verification number.**
I'm sorry. That isn't very clear.
Many banks have a merchant verification line.
Q. Okay.
A. **And often that line is an automated line. And it will simply verify if funds are available in that account to cover that amount of that check.**
Q. Okay. To what extent was that a standard policy, to call the merchant verification line for somebody who's -- was moving out for the last month?
A. **I understood the question. But the first phrase was to what extent?**
Q. Yeah.
A. **That was a policy --**
Q. Okay.
A. **-- across-the-board.**
Q. Were there ever any exceptions to that policy?
A. **Not that I can recall.**
Q. Okay.
A. **Or not that I can...**
Q. Were there other times where you would call the



merchant verification line when you received a rent check?
A. **Yes.**
Q. And describe those to us
A. **Let's see. If a part -- if a resident had the previous month -- if their check had been returned by a bank for non-sufficient funds, the following three months we would do follow-up calls to make sure that the next checks were at that point valid --**
Q. Okay
A. **-- or verifiable.**
Q. Any other times or circumstances under which you would do the -- or take advantage of the merchant verification line?
A. **We verified security deposit checks at the time a new resident applied and was approved before deposit.**
Q. Who was the person who actually called the merchant line?
A. **Usually me.**
Q. Okay. Anyone else?
A. **I'm not recalling if Mr. Kreisler ever did it or not.**
Q. So those would be the only two people who might



have been involved in that?
A. **That I can think of now, yes.**
Q. Okay. Going back to this document and then the page ending 91, there was another -- on the very first line there was a notation, "PRR."
A. **Uh-huh.**
Q. Do you remember what that is?
A. **Yes, I do. Prorated rent.**
Q. Okay. And can you describe what that means, please?
A. **A resident maybe moved in, rather than on the 1st of the month, into the month, and so they had credit -- prorated rent.**
Q. Okay.
A. **Yes.**
Q. And then on the next page ending in 92, --
A. **Uh-huh.**
Q. -- about the middle of the page, --
A. **Oh.**
Q. 2124-9?
A. **Uh-huh.**
Q. Going to the middle of that line, "LRP"?
A. **Late rent payment.**
Q. Okay. And what was the policy on late rents?
A. **Any rent postmarked on or before the 5th day of**

**the month is considered an on-time payment. Rents are due on the 1st of the month. There is a five-day grace period. Any rents postmarked after the 5th day of the month are considered a late payment.**
Q. And was there a late payment charge applied when somebody had a rent check posted after that date?
A. **Yes.**
Q. The 5th?
A. **Yes.**
Q. And how much was that for?
A. **Twenty-five dollars.**
Q. Okay. So would that be reflected then in the column -- two columns after LRP?
A. **Yes.**
Q. Were there any exceptions to the 5th date postmark rent rule?
A. **Not that I can think of.**
Q. What if somebody -- for example, a tenant got paid on the 5th and, you know, their bank account had it direct deposit on the 5th?
A. **If it's postmarked on or before the 5th day of the month it would be timely.**
Q. Uh-huh. But if somebody didn't have the money



in their account until the 5th, --
A. **I -- I would not make -- I would not be the one to make the judgment on that.**
Q. And who would?
A. **Mr. Kreisler.**
Q. Okay. And let me see if there's anything else.
And if you can just look at the last column of -- let's go back to page -- ending with 92. What does that last column reflect?
A. **The date.**
Q. Date of what?
A. **The date that the check was received and entered on to the rent roll.**
Q. Okay. Okay. So do you have any notation in the rent rolls of when the date -- or when the rent payment was postmarked?
A. **No.**
Q. Okay. And did you all keep the envelopes to -- that the rent payments would arrive in? Were those kept at all?
A. **I believe we did it in that time frame. We would retain the rent envelope showing the postmark for late rent payments. The other envelopes were not retained.**
Q. And where would that late postmarked envelope be



retained?
A. **In that resident's file.**
Q. Okay. To the best of your knowledge could you describe -- we talked a little about late rent payments.
A. **Uh-huh.**
Q. Could you describe what the procedure was for filing UDs or unlawful retainers?
MS. BRANDT: Detainers?
MS. SHORE: I'm sorry. Detainers.
MS. BRANDT: Only lawyers would say that.
MS. SHORE: I said retainer.
THE WITNESS: On the 6th day of the month, after we received the rent, we complete a *First Notice* to a resident that says, in effect, "We have not yet received your rent. Your rent is now due and your rent is now past due. Please call the office if you have any questions." And that notice -- something to that effect. And that notification would be delivered to that resident's apartment door.
BY MS. SHORE:
Q. Okay.
A. **On the --**



Q. Go on.
A. **On the 8th day of the month, after the rent was collected from the post office, we would again send a second final notice to the residents from whom we had not yet received their rent. And, again, that notification would say something to the effect of, "We still have not received" -- well, I'm sorry, it did not have the word "still" in it. "We have not received your rent payment. It is past due." Something to the effect of, "We do file unlawful detainers beginning on the 10th of the month. This is a serious matter. Please contact the office."**
Q. Okay.
A. **Something to those -- effect.**
Q. And then what would happen after that 10th day?
A. **I would then provide the list to Mr. Kreisler of -- pardon me.**
I also provided him with the list on the 6th day of the month.
Q. Okay.
A. **And would update it on the 7th and 8th, eliminating the payments that had come in.**
On the 10th day of the month, he again had an updated listing of outstanding rents for that

Page 81

month, --
Q. Uh-huh.
A. **-- and he would take it from there.**
Q. And let me just ask you this: Who is the one who determines this policy with respect to UDs?
A. **Mr. Kreisler.**
Q. Okay. Did you have any input in that?
A. **No.**
Q. Okay. And was this policy applied to all the Kreisler Real Estate properties?
A. **Yes.**
Q. Okay. And I just want to clarify -- we're going to always -- unless I otherwise state, we're going to always be talking about the time frame from November '98 to about January 2001.
A. **Thank you.**
Q. I said Kreisler Real Estate properties. I'm aware that Mr. Kreisler was involved in KT Properties, as well.
And if we go back to Exhibit 2, you look on the first page of Exhibit 2 ending in the Bates stamp 88, this document includes KT Properties, as well; is that correct?
A. **Yes.**
Q. Okay. So my question is: Did these policies

Page 82

apply to all the KT and Kreisler Real Estate properties?
A. **Yes.**
Q. Okay.
A. **Across-the-board.**
Q. Okay. Are you aware of any exceptions granted to these UD policies?
A. **Not -- I'm not familiar. I can't recall anything.**
Q. Okay. You talked about how you would give an updated list to Mr. Kreisler after the 10th day. What happened after that?
A. **Mr. Kreisler would handle it from there in terms of if the rent came in, or the filing of the unlawful --**
Q. Detainer?
A. **Correct. Correct.**
Q. And what was your involvement in that process?
A. **I would notarize the forms, the unlawful detainer forms.**
Q. Did you do anything else after that 10th day, in terms of effectuating the UDs?
A. **I don't know what "effectuating" means.**
Q. I'm sorry.
In terms of making sure that the UD process

Page 83

was carried out?
A. **No.**
Q. Okay.
MS. SHORE: I guess I'll mark this. This is going to be Exhibit 3.
(Exhibit 3 marked.)
BY MS. SHORE:
Q. I'm just going to ask you to take a quick look at this document, please, Ms. Ream.
A **(Reviewing exhibit.)**
MS. SHORE: And just for the record, this is a document entitled, "Unlawful Detainer Complaint." And at the top of the page it's listed, pre-printed, "County of Hennepin" and then written, "Kreisler Real Estate Company" on the top, with other information contained in the actual document itself, handwritten information.
Ms. Ream, does this document look familiar to you?
A. **This particular document is neither familiar or not familiar. The form is familiar.**
Q. The form is familiar. Okay. And can you tell us what this form is?
A. **It's the *Unlawful Detainer Complaint* form.**
Q. Okay. And can you look at the bottom left-hand

Page 84

corner of the document, please?
A. **Uh-huh.**
Q. And is that your signature there?
A. **Yes.**
Q. And beneath it, it says -- it's printed, "Court Clerk or Notary"; is that correct?
A. **Correct.**
Q. Okay. So is it fair to say this is an example of one of the UDs that you would notarize?
A. **Correct.**
Q. Okay. What would you do with this document once you notarized it?
A. **Return it to Mr. Kreisler.**
Q. Would you retain any kind of copy of it?
A. **This particular -- I believe, to the best of my understanding, this document, signed and notarized, would be taken to the county Government Center.**
Q. Would you make any copies of it before it was taken to the Government Center?
A. **To the best of my knowledge they make copies there for you.**
Q. Okay. And was there at some point in time where a copy of this would go into the file of the tenant against whom the UD was issued?

A. **The type set looks the same.**
Q. Okay. And if you can go to the third page of the document collection, ending in 65, Bates stamp number
A. **Uh-huh.**
Q. There's some redactions that occurred here.
A. **Uh-huh.**
Q. Do you know who redacted that information?
A. **No.**
Q. Okay. And at the top of the page it states, "The following applications were declined or the approved applicant chose not to take possession of the apartment..." --
A. **Uh-huh.**
Q. -- et cetera.
Do you know who would collect that kind of information, as to who -- which applications were declined or chosen -- the applicant chose not to take possession of the apartment?
A. **I collected it.**
Q. Okay. So is it fair to say that you would have been the one who would have gathered the information contained in this document?
A. **Correct.**
Q. Okay. But you don't actually remember drafting



this document?
A. **This one is different than these. This is familiar to me.**
Q. Okay. So is it fair to say you drafted that document?
A. **Yes.**
Q. And the information that's contained in that document, where did you get it from?
A. **The files on declined applicants.**
Q. And with respect to each entry, there's -- I'm going to just paraphrase to try to save time here. There's name, address and notation at the end of each entry that states approval or disapproval and then there's an ethnicity listed or race, Black.
A. **Uh-huh.**
Q. Who determines that ethnicity?
A. **Mr. Kreisler.**
Q. And where did you get that information that was determined by Mr. Kreisler to record on this document?
A. **On the application we would just take a *Post-it* -- this is a required piece for compliance --**
Q. Okay.



A. **-- for Stephanie Ball.**
**And it was required that we determine, as best we could, ethnicity**
Q. Okay.
A. **So there would be a *Post-it Note* stuck on the applications.**
Q. And the *Post-it Note* stated what?
A. **Their ethnicity.**
Q. Okay. And who wrote that *Post-it Note?*
A. **Mr. Kreisler.**
Q. Was he the only one involved in making that determination?
A. **Yes.**
Q. And the handwriting at the top right-hand of this document, whose handwriting is that?
A. **I do not know.**
Q. Okay. I'm going to again -- just being conscious of time, I'm going to try to really quicken the pace here.
I wanted to just ask you a few questions about the repair policies and/or procedures.
To what extent was there a general master list of repairs that were requested?
A. **Master list -- in that time frame, I do not know.**



Q. How was a repair request made?
A. **In writing. There are cards that would be sent in and those would be collected in the mail and routed on to either Mr. Kreisler or Mr. Pietrzak, depending on the time frame.**
Q. Okay. And if you can direct your attention back to what I originally had shown you as Exhibit 1 and take a quick look at that document.
A. **Sorry. There it is. Okay.**
Q. Does that document accurately reflect the repair policy or procedure?
A. **I believe so, yes.**
Q. Okay. And were there any other ways to report a repair other than sending in the card as delineated in this document?
A. **I'm not sure what you mean.**
Q. Could somebody actually call in a repair, a tenant, and make a request for repair?
A. **I -- certainly they could pick up the phone and call in the request.**
Q. Was -- okay. Let's start with the -- when Kreisler Real Estate office was located on West Elm Street. What would be the phone number -- not the exact phone number, but where would phone calls be directed if a tenant, say,

wanted to report a repair by phone, or an emergency situation repair, like somebody's roof collapsing, when Kreisler Real Estate was still operating out of the West Elm location?
A. **For emergencies I would -- the call would come into the West Elmwood office. I would take the message, "Here's a message," whichever.**
**And for an emergency I would pick up the cell phone and contact either Mr. Pietrzak or Mr. Kreisler.**
Q. Okay And once the office was moved to 2500 Blaisdell, --
A. **Uh-huh.**
Q. -- what -- or let me correct that. Where would people call if they wanted to actually report a repair or an emergency repair?
A. **An emergency repair would be taken in that same way. Non-emergency repairs -- we asked them to send a card in.**
Q. Okay.
A. **It does not have to be a card. It can also be handwritten out.**
Q. And --
A. **They can mail it in.**
Q. In this letter, if you look at the



second-to-the-last paragraph, the fourth line, there's a pager number, 3501168; whose pager was that, do you know?
A. **It's a general -- it's a pager dedicated to after-hours emergencies.**
Q. So --
A. **Whoever had after hours emergency duty would have that pager.**
Q. So who would be the ones -- the individuals associated with Kreisler Real Estate who had after-hour duties?
A. **In this time frame, to the best of my knowledge, it would be Mr. Pietrzak, Mr. Kreisler. I -- that -- those two people who I would recall doing that.**
Q. And would that hold true for Whittier, as well?
A. **Yes.**
Q. Okay. And when the car is -- going back to the cards asking for repair requests, when those came in who was responsible for picking those up at the mail, post office box?
A. **Predominantly myself.**
Q. And when you picked those up, what did you do with them once you picked them up?
A. **I would sort them out. Would try to remember --**



**99% of the time, date the date they were received. And then route them on to Mr. Pietrzak.**
Q. Okay. Was there a log that you would have recorded the repair request card in?
A. **No.**
Q. Okay Is it possible -- well, let me back up
What if somebody called in a repair and left a message, how would that be dealt with?
A. **I believe -- I don't really recall.**
Q. Was there any record if somebody called in for a repair request?
A. **Yes. I would write the -- I would write the message down and pass it on.**
Q. Okay. Was there a log of that?
A. **Just that handwritten -- not a log, no.**
Q. Okay. So is it possible that a maintenance request or -- let me rephrase to the language I've been using -- repair request was unrecorded?
A. **It certainly could be possible.**
Q. Okay. And similarly it's possible then that a repair request might not have been attended to?
A. **Anything I guess is possible.**
Q. Okay. Just a few questions on the tenant



communication issues.
What was the procedure for reading tenant correspondence? And I'll just leave it at that.
A. **As I opened the mail, if there was correspondence I would staple the envelope to the back of the correspondence and route it on to Mr. Kreisler.**
Q. Okay. And what was the procedure for responding to tenant correspondence?
A. **That would be Mr. Kreisler's procedure.**
Q. Who would draft the response to a tenant?
A. **He would.**
Q. Okay. Who would type it?
A. **I would.**
Q. Was there anyone else involved in that process?
A. **Well, again, in that time frame I mentioned that we may have had and utilized a secretarial service at that time. I don't recall.**
Q. How often did you use a secretarial service?
A. **Well, I'm not recalling very well. But I just know there was a time frame. I don't know.**
Q. Okay. And what about for Whittier? Same procedure for reading tenant correspondence?
A. **Yes.**
Q. And for responding to it -- Mr. Kreisler was